IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FILED

SILICON POWER CORPORATION                         :        CIVIL ACTION

                                SEP: 2 9 2009

        v.                      MICHAEL E. KUNZ, Clerk
                                By           Dep. Clerk

GENERAL ELECTRIC                                  :
ZENITH CONTROLS, INC.                             :        NO.  08-4331

## MEMORANDUM

**Padova, J.**                                            **September 29, 2009**

Silicon Power Corp. ("Silicon Power") commenced an arbitration under the Federal

Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16, against General Electric Zenith Controls, Inc. ("GE

Zenith") on December 18, 2003, claiming that GE Zenith had breached two agreements between the

companies related to the development and sales of low voltage static transfer switches ("LVSTS").

On June 11, 2008, the arbitrator denied Silicon Power's claims in all respects.  Silicon Power

subsequently filed the instant Motion to Vacate Arbitration Award in this Court.  GE Zenith filed

a Response in Opposition to the Motion and we held a Hearing on September 11, 2009.  For the

following reasons, we deny the Motion to Vacate Arbitration Award.

## I.      FACTUAL BACKGROUND

### A.      Silicon Power's Innovative Electric Transfer Switch Technology

Transfer switches switch a component from one power source to another in the event that the

first power source fails.  (8/20/07 Arb. N.T. at 26-27.)  In 1998, Silicon Power developed a low

voltage transfer system and subsequently developed technology for ultra fast low voltage static

transfer switches ("UFLVSTS").  (Id. at 18, 20, 22-23.)  Silicon Power developed a prototype

UFLVSTS in 2000.  (Id. at 23, 28.)  In 2002, the prototype was able to transfer between two power

sources within one millisecond.  (Id. at 28.)

In July 2000, Silicon Power commenced discussions with Bank of America regarding a possible initial public offering. (Id. at 33.) Bank of America encouraged Silicon Power to obtain mezzanine financing and Silicon Power held investment discussions with GE Capital beginning in September 2000.[1] (Id.) GE Capital brought in GE Zenith to discuss two proposals, a joint development agreement for development of the UFLVSTS technology and an exclusive distribution agreement. (Id. at 33-35.) GE Capital's investment in Silicon Power was contingent on Silicon Power using GE Zenith as a distributor. (8/23/07 Arb. N.T. at 501.)

GE Zenith was in the critical power market but did not sell static transfer switches. (12/10/07 Arb. N.T. at 16.) GE Zenith had customers who used static transfer switches purchased from other vendors and was interested in Silicon Power's UFLVSTS technology. (Id. at 16; 12/12/07 Arb. N.T. at 10-11.) GE Zenith understood from Dr. Mehta, President and CEO of Silicon Power, that the UFLVSTS technology would outperform existing technology in terms of speed and size, would have a significant cost advantage, would dissipate less heat, and would take up less floor space than existing LVSTS products. (12/10/07 Arb. N.T. at 9.)

During GE Zenith's discussions with Silicon Power regarding the UFLVSTS, the parties also discussed developing and marketing LVSTS products in order to generate revenue to fund the development of the UFLVSTS. (Id. at 9-10.) The market for LVSTS products was very strong during the late-2000 to early-2001 time period when GE Zenith and Silicon Power were engaged in these discussions. (Id. at 10-11.)

---

[1] GE Equity, part of GE Capital, eventually invested $6 million in Silicon Power for the development of the UFLVSTS. (12/10/07 Arb. N.T. at 7-9.)

B.      The Agreements Between GE Zenith and Silicon Power

GE Zenith and Silicon Power negotiated two agreements, a Joint Development Agreement

("JDA") and a Sourcing and Distribution Agreement ("SDA"). (Silicon Power Exs. 2, 3.) Under

the SDA, Silicon Power agreed to provide and sell LVSTS and UFLVSTS products to GE Zenith

on a sole and exclusive basis. (SDA Article 3.1.) GE Zenith was granted the exclusive right to sell

and distribute the LVSTS and UFLVSTS products in the United States, Canada and Mexico during

the period beginning with the execution of the agreement on September 21, 2001, and terminating

on the fifth anniversary of the date of the commercial launch of Silicon Power's LVSTS products.

(Id., Articles 1, 2.1, 3.1.) GE Zenith was required to market these products using its "established

sales channels." (Id., Article 4.1). The SDA contains the following sales targets:

1.      During the period from September 21, 2001 until the date that Silicon Power
        launched its LVSTS products, GE Zenith was to obtain $5 -7 million in orders. (Id.,
        Article 4.1.)

2.      During the first twelve months following the launch date of the LVSTS products, GE
        Zenith was to obtain $12 million in orders. (Id., Article 4.2.)

3.      The goal for the second year after the product launch was to capture 15% of the
        LVSTS market. (Id., Article 4.3.)

The sales targets were estimates to be used for planning purposes, "not a commitment by [GE

Zenith] to purchase any quantity of Products." (Id., Article 4.4.) The SDA provided that, if GE

Zenith failed to achieve orders in the target range, the exclusivity provisions of the agreement would

terminate. (Id., Article 4.5). In addition, senior management from both parties were to meet and

negotiate a mutually agreeable solution for GE Zenith's failure to achieve the orders target. (Id.,

Article 4.6) If the parties could not reach a mutually agreeable solution within 30 days of such meeting, either Party would have the right to terminate the SDA under the termination provisions of the agreement. (Id.)

The SDA contains the following termination provision: either party could terminate the agreement if the other repudiated or breached the agreement and did not cure within 90 days after receiving written notice of the breach. (Id., Article 2.3.) The SDA also provides that any disputes not settled by negotiation were to be arbitrated in accordance with the CPR Rules for Non-Administered Arbitration. (Id., Article 15.5.) The arbitration would be governed by the FAA, take place in New York, New York before a single arbitrator, and use New York law. (Id.) The SDA also provides that neither party could appeal the arbitrator's award: "Neither Party shall seek recourse to a law or equity court or other authorities to appeal such decision." (Id.)

The parties' companion agreement, the JDA, governed the parties' roles relating to the development of LVSTS and UFLVSTS products. (JDA Articles 1.I., 2.A.i.) The JDA contains specific requirements for development of the LVSTS and UFLVSTS products. (Id., Attachs. A, B.) The JDA also contains lists of specific development tasks that Silicon Power and GE Zenith were to perform and the dates on which those tasks were to be completed. (Id., Attachs. C, D.) The JDA also provides that the parties would each receive an equal, undivided interest in all joint inventions developed pursuant to that agreement. (Id., Article 6.A.)

Like the SDA, the JDA also contains a provision whereby any disputes between the parties that could not be settled by negotiation would be arbitrated in accordance with the CPR Rules for Non-Administered Arbitration. (Id., Article 7.) The arbitration would be governed by the FAA and take place in New York, New York before a single arbitrator using New York law. (Id.) The JDA

4

also provides that neither party could appeal the results of the arbitration: "Neither Party shall seek recourse to a law or equity court or other authorities to appeal such decision." (Id.)

      C.     GE Zenith's Sales Efforts Regarding Silicon Power's LVSTS Products

Evidence was presented at the arbitration that, beginning in October 2001, GE Zenith put considerable effort into marketing Silicon Power's LVSTS products. (1/31/08 Arb. N.T. at 117, 119-21.) GE Zenith assigned Tim Cole as the product manager for the LVSTS. (12/12/07 Arb. N.T. at 25.) Cole has a degree in civil engineering and an MBA. (1/31/08 Arb. N.T. at 75-76.) He was also trained "as a G.E. six sigma black belt." (Id.) Cole spent about 80% of his time on the LVSTS. (12/13/07 Arb. N.T. at 201.) GE Zenith also assigned Spas Lazarov to work on sales for the LVSTS. (12/14/07 Arb. N.T. at 127-28, 132-33.) Lazarov has a dual degree in electrical and electronics engineering, and was an international sales manager with regional manager responsibility within the United States for GE Zenith. (Id. at 127-28, 131, 133.)

In addition to his personal involvement in LVSTS sales, Lazarov was also involved in training GE Zenith sales representatives with respect to the LVSTS. (Id. at 133-34.) GE Zenith and Silicon Power held three training sessions for GE Zenith's sales team in October and November 2001. (GE Zenith Ex. N.) The first session was held in Las Vegas, and at least one other session was held at Silicon Power's Exton, Pennsylvania facility. (12/13/07 Arb. N.T. at 211; 12/14/07 Arb. N.T. at 134; 1/31/08 Arb. N.T. at 86.) The Silicon Power employees gave the GE Zenith sales representatives an overview of the LVSTS, explained how it worked, and discussed sales strategies. (1/31/08 Arb. N.T. at 85-86.)

After these training sessions, Lazarov went to Silicon Power's factory to become more familiar with the LVSTS. (12/14/07 Arb. N.T. at 134.) He subsequently conducted multiple training

sessions on the LVSTS product for his sales representatives, regional managers and consultants at GE Zenith's Chicago factory, where a demonstration LVSTS had been installed. (Id. at 136.) GE Zenith loaded some large lamps on the demonstration LVSTS to show its sales force and potential clients how it transferred power between sources. (Id. at 137.) GE Zenith would typically have a visitor observe demonstrations of the LVSTS. (Id. at 18.) In addition, GE Zenith's sales representatives and manufacturers' representatives did "engineering lunch-and-learns" to promote the LVSTS.[2] (12/14/07 Arb. N.T. at 18.)

Thomas Duffy, who is presently the President of GE Zenith and was previously its Vice President of Sales for Power Quality, was also involved in GE Zenith's LVSTS sales efforts. (12/13/07 Arb. N.T. at 190, 195-96, 200.) During the arbitration, he explained that GE Zenith's sales efforts fit within its existing sales channels. (12/13/07 Arb. N.T. at 195-96.) As he explained, GE Zenith's sales representatives regularly lobby engineers and architects to approve GE Zenith's products for their projects so that GE Zenith can bid on their jobs. (Id. at 195.) Duffy explained that it is very important to be "named as an acceptable manufacturer in a bid specification . . . . So you have to call on this gate keeper, consulting engineer to get them to approve your product." (Id. at 195-96.) Consequently, GE Zenith sales representatives have relationships with major engineering

---

[2]Thomas Duffy testified that, in 2001, GE Zenith employed eight to ten sales representatives who worked exclusively for GE Zenith and 75-100 manufacturers' representatives (working for 28 different companies) who sold products for GE Zenith and also sold complimentary power products. (12/13/07 Arb. N.T. at 44, 193-94.) In addition, GE Industrial had 600 salespeople "who would, if they received an inquiry or if they ran into a customer who had a need for these kind of products, would lead share that back into G.E. Zenith." (12/10/07 Arb. N.T. at 146.) GE Industrial salespeople who provided leads to GE Zenith would be compensated through a lead sharing system outside of their normal commission plan. (Id. at 150-52.) In May 2002, 23 of the 28 companies whose manufacturers' representatives sold the Silicon Power LVSTS for GE Zenith did not sell a competitive LVSTS product. (Id. at 153-55.)

and architectural firms and call on these firms as part of their usual sales practices. (Id. at 197-98.) GE Zenith's sales representatives also call on end users, typically facility engineers, managers, and electrical contractors. (Id. at 198; 1/31/08 Arb. N.T. at 88.)

In addition to these efforts, GE Zenith's sales representatives held frequent telephone conferences to alert each other of sales opportunities. (Id. at 88-89.) GE Zenith also ran incentives with its manufacturers' representatives to "make sure we were getting our fair share of the sales guys' marketing time . . . ." (Id. at 92.) In addition, GE Zenith encouraged its sales representatives to promote the Silicon Power LVSTS products even in instances where they knew that another product had been specified by the architect or engineer. (Id. at 92-93.)

GE Zenith took additional steps to market the LVSTS product. It issued a press release on November 5, 2001, stating that it would "market and sell Low Voltage Static Transfer Switches (LVSTS) in North America." (GE Zenith Ex P.) It also mentioned the LVSTS products in a January 2002 article in US Industry Today magazine, a trade publication. (12/11/07 N.T. at 108.) GE Zenith also prepared product bulletins for Silicon Power's LVSTS products in the 100A through 600A size. (1/31/08 Arb. N.T. at 112.)

GE Zenith also gave incentives to its sales representatives to provide the company with competitive market information about price levels and product offerings. (12/11/07 N.T. at 109.) In addition, GE Zenith made a presentation about the product to the CEO of GE Industrial Systems, his staff, and all of the executives in the GE Industrial Systems organization. (Id. at 115.) GE Zenith staff also attended national trade shows with Silicon Power to market the LVSTS product. (GE Zenith Ex. R at 5.) Lazarov also attended local trade shows to develop relationships with local engineers and data center owners. (12/14/07 Arb. N.T. at 151-52.)   GE Zenith had one or two

7

demonstration LVSTS products that they brought to trade shows. (1/31/08 Arb. N.T. at 87.)

D.     GE Zenith's Difficulties Selling Silicon Power's LVSTS

Despite these efforts, GE Zenith had considerable difficulty selling Silicon Power's LVSTS products. It did not receive its first order for an LVSTS product late until late in the second quarter of 2002. (12/10/07 Arb. N.T. at 71.) ) There is evidence in the arbitration record that overcapacity of internet companies and telecommunications companies, together with the terrorist attacks of September 11, 2001, caused demand for LVSTS in the critical power industry (the largest market for LVSTS products) to decline sharply, approximately 60%, after the parties entered into the SDA and JDA. (12/11/07 Arb. N.T. at 88-90; 12/12/07 Arb. N.T. at 187-88; 12/13/07 Arb. N.T. at 7; 12/14/07 Arb. N.T. at 32-33; 1/31/08 Arb. N.T. at 138-40.) In addition, many customers who had previously purchased LVSTS products for data centers began to resell them "just like new" in 2002, depressing the price for new LVSTS products. (12/13/07 Arb. N.T. at 7-8.) Consequently, in early and mid-2003, GE Zenith learned that all of its quotes were priced too high because the market had collapsed. (12/14/07 Arb. N.T. at 33-34.) GE Zenith reduced its 25% markup on Silicon Power's LVSTS products and still received feedback that its quoted prices were as much as twice the competitive market price. (12/10/07 Arb. N.T. at 122-23.)

There is also evidence in the arbitration record that GE Zenith's sales efforts were hampered because Silicon Power did not provide GE Zenith with a prototype LVSTS until the second quarter of 2002. (12/14/07 Arb. N.T. at 4.) On reason for the delay was that Silicon Power had designed its LVSTS units with circuit breakers from one of G.E.'s competitors and GE Zenith would not sell the LVSTS products unless they used G.E. breakers. (8/21/07 Arb. N.T. at 100-01.) Silicon Power had to engage in a significant redesign in order to accommodate the G.E. breakers. (Id. at 100.)

8

When Silicon Power began its redesign, it had limited engineering resources and, therefore, started with the unit sizes that it thought were most common in the marketplace. (Id. at 109.) Silicon Power started with the 100 - 400 amp units which were the most marketable. (Id. at 110.) Silicon Power next focused on redesign of the 600 to 1200 amp units, which pushed out the design time-frame for the 1600 to 2000 amp units. (Id.) These delays further hampered GE Zenith's sales efforts because it did not have a complete product line ready for sale. (1/31/08 Arb. N.T. at 102-03; 12/14/07 Arb. N.T. at 32.)

GE Zenith also had other problems selling the LVSTS. According to Duffy, while Silicon Power's LVSTS was an adequate product, it was not superior to the competition. (12/13/07 Arb. N.T. at 202.) In addition, GE Zenith had no reliability data regarding Silicon Power's LVSTS to give to potential customers. (12/14/07 Arb. N.T. at 33, 49, 141.) Silicon Power's LVSTS products also missed some segments of the market because none of Silicon Power's LVSTS products combined the LVSTS with a power distribution unit ("PDU"). (Id. at 32.) Silicon Power worked with a company called Qualmag to develop a combined PDU/STS product. (1/31/08 Arb. N.T. at 129-30.) Silicon Power completed development of a combined PDU/STS May 2002, but GE Zenith never went forward with sales of that product. (12/10/07 Arb. N.T. at 93-94.) GE Zenith also had trouble getting timely quotes for prices for LVSTS products from Silicon Power because Silicon Power stopped manufacturing the switches in-house. (GE Zenith Ex. U.) In June, 2003, GE Zenith complained to Silicon Power that it was taking Silicon Power weeks to get it quotes when GE Zenith had only a few days to respond to customers, leading to lost orders. (Id.) Moreover, Silicon Power needed a six month lead time to produce some of its products to fill orders, which was two to three times longer than its competitors. (GE Zenith Ex. V.)

9

In addition, Silicon Power's LVSTS products depended on single power supply, creating a "single point of failure" that the critical power market considered to be a design defect. (12/14/07 Arb. N.T. at 31.) Cole explained that "whenever you create the possibility of a single point of failure or someplace where your redundancy is questionable, that becomes a giant . . . potential problem for [customers in the critical power market.]" (1/31/07 Arb. N.T. at 93-94.) The other LVSTS products on the market at that time typically had two power supplies and one of GE Zenith's competitors manufactured a LVSTS product with three power supplies. (12/14/07 Arb. N.T. at 31.) In addition, the vast majority of the Silicon Power LVSTS products GE Zenith sold failed. (12/10/07 Arb. N.T. at 133.) Consequently, the Silicon Power LVSTS was not perceived as a high quality product. (Id. at 134-35.)

Evidence was presented at the arbitration that Silicon Power LVSTS products that GE Zenith sold to three customers failed catastrophically. GE Zenith sold three LVSTS products to John Deere. (8/24/07 Arb. N.T. at 90.) When the switches were tested during installation, one of the switches "went back and forth between prime power and alternate power . . . a thousand times or something and that obviously wasn't by design . . . ." (1/31/08 Arb. N.T. at 91.) In November 2003, after the switches were installed, one of the switches experienced a catastrophic failure causing 30 tape storage device power supplies to fail. (GE Zenith Ex. AA.) The failure occurred in the John Deere facility that ran that company's parts inventory worldwide and the data had to be manually recovered. (12/14/07 Arb. N.T. at 163.) GE Zenith eventually fixed the problem with the John Deere switches by replacing some circuit boards. (Id.)

GE Zenith sold a Silicon Power LVSTS to Bridge Securities in South Korea. That switch failed in October 2003, causing the South Korean stock exchange to shut down. (Id. at 171-75; GE

10

Zenith Ex. CC.) Silicon Power repaired the switch by replacing a gate driver. (GE Zenith Ex. CC.)

There were also problems with three Silicon Power LVSTS products that GE Zenith sold to Caterpillar Financial for use in its data center. (12/14/07 Arb. N.T. at 34-35.) GE Zenith's contractor, Travis Electric, went out to Caterpillar to do the startup and the switches didn't work. (Id. at 36, 39.) Although all three switches were supposed to be the same model, one was not, and its MMI Panel and control board did not match those of the other two switches. (GE Zenith Ex. EE.) There was also a problem with the firmware -- the software in the microprocessors built into the switches -- in that each of the three switches had different firmware. (12/14/07 Arb. N.T. at 36-37.) Moreover, because the switches were installed in a working data center, repairs could only be made if the entire system were shut down. (Id. at 37.) Silicon Power personnel made three visits to the Caterpillar Financial site over a period of months, but could not get the switches to work. (Id..) GE Zenith eventually took back the switches and Caterpillar installed a competitor's LVSTS products. (Id. at 37-38.) Travis Electric Company complained that the switches "were shipped out of [the] manufacturing facility missing major components that would have been easily recognized had someone inspected them first." (GE Zenith Ex. EE.) Caterpillar Financial complained that, once it uploaded newer software, it was able to get one of the switches to work; however, after several transfers, it shut down because several fuses had blown and part of its gate drive assembly had to be rebuilt. (Id.) Caterpillar Financial also reported that the switches were "shipped with missing parts, Kirk keys, documentation and nuts, bolts, screws and wiring falling out of the equipment. Two of the units had identical serial numbers. It would appear that the quality control department was out to lunch that day." (Id.)

11

E.    Work that Silicon Power asked GE Zenith to Perform with respect to the LVSTS

There is also evidence in the arbitration record that GE Zenith did not complete all of the tasks that Silicon Power believed it was required to perform under the JDA and SDA. For example, Silicon Power asked GE Zenith to perform a market study for the LVSTS products and GE Zenith never performed the study. (12/10/07 Arb. N.T. at 61-62.) In addition, GE Zenith did not have Silicon Power's LVSTS products entered into G.E.'s corporation-wide order entry system, SPEEDI. (1/31/08 Arb. N.T. at 125-26.) Silicon Power also complained that GE Zenith did not advertise the LVSTS products as required by Appendix B of the SDA. (SDA App. B.)

F.    The Arbitration

As discussed previously, GE Zenith did not have much success selling Silicon Power's LVSTS products. (12/10/07 Arb. N.T. at 71.) GE Zenith fell significantly short on quote activity and on orders compared to the SDA's targets. (Id. at 146, 206.) The relationship between the parties deteriorated significantly as a result. On September 4, 2002, Dr. Mehta sent a letter to James Rogers, President and General Manager of GE Zenith, informing him, pursuant to Article 4.5 of the SDA, that GE Zenith had failed to meet its quarterly orders goal. (GE Zenith Ex. FF.) On December 18, 2002, Rogers wrote a letter to Mehta, offering to waive GE Zenith's right to exclusivity for the sale and distribution of the LVSTS. (12/10/07 Arb. N.T. at 188-89.) In March 2003, an attorney for GE Industrial Systems wrote to Silicon Power, offering to waive exclusivity rights for the LVSTS under the SDA, but stating that GE Zenith would not waive its rights under the JDA with respect to the UFLVSTS. (Id. at 190; Silicon Power Ex. 22.) On July 28, 2003, GE Zenith officially terminated the JDA and SDA between GE Zenith and Silicon Power. (12/10/07 Arb. N.T. at 96-97; GE Zenith Ex. GG.)

12

Silicon Power brought a claim in arbitration against Silicon Power on December 18, 2003. (Silicon Power Ex. 4.) The claim stated, generally, that GE Zenith breached the SDA and JDA by failing to meet its sales targets, failing to use its best efforts to achieve its sales targets, and failing to complete its required tasks under the JDA. Silicon Power also claimed that GE Zenith made material misrepresentations of fact or omitted material facts and provided false information to guide Silicon Power in its business transactions. (Id. at 11-13.) Silicon Power initially requested damages in the amount of $12 million, reflecting the sums it expended in preparing for production, lost profits, lost opportunities, and lost enterprise value. (Id. at 13-14.) Silicon Power eventually raised its demand, requesting damages for breach of contract in the amount of $371,961,000 and tort damages in the amount of $61,940,000, for a total of $433,901,000. (Silicon Power Ex. 17 at 2-3.)

Silicon Power summarized its claim in its Post-Trial Brief for the arbitrator as follows. GE Zenith was required to understand the critical power market to determine the types, configurations, and designs of LVSTS products the market demanded (such as stand-alone LVSTS products or LVSTS products integrated with PDUs). (Id. at 3-4.) GE Zenith did not take the steps necessary to understand these factors and, consequently, selected products for Silicon Power to produce that missed 75% of the critical power market. (Id. at 4.) GE Zenith was also required to understand the critical power market to determine the types, configurations and designs of UFLVSTS products the market demanded, but never completed this step. (Id.) In addition, since GE Zenith had the exclusive right to market and sell the LVSTS in North America, it was obligated under New York law to use its best efforts to market the LVSTS, but did not. (Id. at 4-5.)

The parties appointed John Wilkinson, Esq. as their arbitrator. He heard eleven days of testimony. (Silicon Power Exs. 6-16.) Wilkinson issued a 27 page opinion on June 11, 2008,

finding in favor of GE Zenith on all of Silicon Power's claims.  (Final Arb. Award at 26.)

Wilkinson first declined "to imply an obligation on the part of GE Zenith to use best efforts to market products covered by the SDA" because GE Zenith did not have "a lock on the market which it could unfairly exploit to Silicon Power's disadvantage."  (Id. at 8-10.) Wilkinson explained that, since the SDA provided that Silicon Power could terminate GE Zenith's exclusive rights, or terminate the contract entirely, if GE Zenith failed to meet its sales targets for any three month period, the SDA was not the type of exclusive dealing contract for which New York law implies a best efforts obligation. (Id. at 10.)  He found, instead, that GE Zenith had made a "solid, good-faith effort to market the SP-LVSTS in the face of extreme adversity."  (Id. at 17.)  He supported his finding with the following examples:

1) GE Zenith assigned its best people to the project, i.e., Tim Cole, Spas Lazarov, Tim Duffy (Id. at 17-18);

2) GE Zenith made extensive efforts to promote the LVSTS by:  issuing a press release; preparing product bulletins; training sales people; preparing promotional materials; promoting the LVSTS at national and regional trade shows; making sales calls on decision makers (owners, architects, engineers, construction managers); conducting lunch and learn sessions; and installing a LVSTS in its Chicago factory and leading demonstration tours for prospective customers.  (Id. at 18-19.)

3) When sales did not reach hoped for levels, GE Zenith made additional efforts beyond its usual sales practices such as:  arranging to pay commissions to salaried personnel from other GE divisions to sell the LVSTS; paying external sales agents for market information; seeking sales outside North America; and cutting its margin on all of its

14

LVSTS sales.  (Id. at 19.)

Wilkinson also rejected Silicon Power's claim that GE Zenith should have hired additional sales people and used different marketing channels and that GE Zenith was making its sales pitches to the wrong people.  (Id. at 20.)  Wilkinson based his rejection on evidence that GE Zenith contacted the individuals, architectural firms, consulting firms and engineering firms that actually made the decisions that would result in sales.  (Id.)  In addition, Wilkinson found that the SDA specifically required GE Zenith to sell the LVSTS through its "established sales channels[,]" which is what GE Zenith did.  (Id.)  Wilkinson further rejected Silicon Power's claim that GE Zenith failed to advertise the LVSTS as required by the SDA, pointing to testimony from both Rogers and a Silicon Power witness that broad based advertising does not work in the critical power market.  (Id. at 20-21.)

Wilkinson also rejected Silicon Power's claim that GE Zenith should have required Silicon Power to produce a joint LVSTS/PDU product and that GE Zenith's failure to do so eliminated the Silicon Power LVSTS products from 50% of the marketplace.  (Id. at 21.)  Wilkinson's determination was based on the SDA, which required GE Zenith to sell "Products," which the SDA defines as the LVSTS and the UFLVSTS, not as a combined PDU/LVSTS product.  (Id.)  Wilkinson further found that GE Zenith had considered selling a combined product but determined, in good faith, that it could not sell a combined product at a competitive price.  (Id.)

Wilkinson also denied Silicon Power's claim that GE Zenith breached the SDA by failing to market a four-pole LVSTS product, which is the prevailing configuration for LVSTS products outside of North America.  (Id.)  The arbitrator found that the SDA, which pertained to North American sales, specifically provided for sales of a three-pole LVSTS.  (Id.)  Wilkinson further

denied a claim made by Silicon Power that GE Zenith breached the SDA by failing to begin its marketing efforts before the execution of the SDA. (Id.) The arbitrator found that the SDA did not require GE Zenith to begin its marketing efforts before the effective date of that contract, which was September 21, 2001. (Id.)

Wilkinson also denied Silicon Power's claims that GE Zenith made intentional and negligent misrepresentations of material facts prior to executing the SDA and JDA. Silicon Power claimed that GE Zenith made the following misrepresentations: "(I) GE Zenith's sales force was capable, well qualified and experienced in the market in which the LVSTS would be sold; (ii) GE Zenith knew and understood the market for the LVSTS; and (iii) GE Zenith had optimistic expectations for sales of the LVSTS." (Id. at 21-22.) The arbitrator found, contrary to Silicon Power's claims, that these statements were true and reflected the good faith opinions of the individuals who made them. (Id. at 22-23.)

Wilkinson also addressed Silicon Power's specific claims that GE Zenith breached the JDA by failing to complete the tasks it was assigned under the scope of work provision found in Attachment D to that agreement. The arbitrator found that the JDA's scope of work provision assigned responsibility for developing the UFLVSTS technology to Silicon Power and assigned to GE Zenith only tasks pertaining to selling the developed technology, such as holding a customer focus meeting, formulating an order-to-remittance strategy plan, conducting a critical to quality review, and formulating a "Market/Commercial Plan." (Id. at 24.) While Silicon Power claimed that GE Zenith failed to complete tasks involving market analysis, Wilkinson disagreed, noting that the record contained evidence that GE Zenith had provided some market feedback to Silicon Power. (Id. at 24.) He also concluded that, even if GE Zenith had breached this provision of the JDA, its

16

breach was not the reason why Silicon Power was unable to develop the UFLVSTS technology into a commercial product. (Id. at 24-25.) He found, instead, that the reason why the UFLVSTS was not introduced "was attributable to the fact that Silicon Power did not design and develop a marketable UFLVSTS." (Id. at 25.) The arbitrator based his finding on a Silicon Power e-mail sent to GE Zenith in April 2003, which stated that Silicon Power had not made progress on the UFLVSTS due to lack of funding and its own decision to focus its R&D money on other technology. (Id. at 25; GE Zenith Ex. Y.) The arbitrator also relied on an April 2003 e-mail from GE Zenith's technology director to James Rogers, stating that Silicon Power could not produce the UFLVSTS "'reliably and in volume.'" (Final Arb. Award at 25 (quoting GE Zenith Ex. II.)

Silicon Power asserts three grounds for vacating the Final Arbitration Award. Silicon Power first argues that the Final Arbitration Award should be vacated because Wilkinson ignored pertinent and material evidence that Silicon Power had developed a prototype of the UFLVSTS and further ignored material evidence proving that GE Zenith breached the JDA. Silicon Power argues second that the Final Arbitration Award should be vacated because Wilkinson failed to address all of the claims asserted in the arbitration. Silicon Power argues third that the Final Arbitration Award should be vacated because the arbitrator manifestly disregarded New York law with respect to GE Zenith's duty to use its best efforts to sell Silicon Power's LVSTS.

II.    STANDARD OF REVIEW

The FAA provides for expedited judicial review of arbitration awards. See 9 U.S.C. §§ 9-11. Under § 9 of the FAA, a court must confirm an award unless it is vacated, modified, or corrected as permitted in §§ 10 and 11. Id. § 9. "There is a strong presumption under the [FAA] in favor of enforcing arbitration awards." Brentwood Med. Assocs. v. United Mine Workers of Am., 396 F.3d

237, 241 (3d Cir. 2005) (citation omitted).  Thus, an award is generally presumed valid and judicial review is extremely deferential.  Id.; see also Dluhos v. Strasberg, 321 F.3d 365, 370 (3d Cir. 2003).

The party seeking to vacate the award bears the burden of proving that vacatur is appropriate. AAMCO Transmissions, Inc. v. Sally, Civ. A. No. 08-151, 2008 WL 5272449, at *3 (E.D. Pa. Dec. 17, 2008) (citation omitted).  "Vacatur is appropriate only in 'exceedingly narrow' circumstances . . . . "  Metromedia Energy, Inc. v. Enserch Energy Servs., 409 F.3d 574, 578 (3d Cir. 2005) (citations omitted).  A court may not vacate an arbitration award because the arbitrator made an error of law.  Local 863 Int'l Bhd. of Teamsters v. Jersey Coast Egg Producers, Inc., 773 F.2d 530, 533 (3d Cir. 1985)).  Moreover, "an arbitrator's 'improvident, even silly, factfinding does not provide a basis for a reviewing court to refuse to enforce the award.'"  Metromedia Energy, 409 F.3d at 578 (quoting Major League Umpires Assoc. v. Am. League of Professional Baseball Clubs, 357 F.3d 272, 279-80 (3d Cir. 2004)).  A court may never "vacate an arbitration award merely because it views the merits of the claims differently or because the court feels that the arbitrator made a factual or legal error."  Jones v. Intarome Fragrance Corp., Civ. A. No. 04-5625,2007 WL 1296656, at *3 (D.N.J. Apr. 27, 2007) (citations omitted); see also Local 853, 773 F.2d at 534 ("The court may not reevaluate supposed inconsistencies in the arbitrator's logic or review the merits of the arbitrator's decision.").

Section 10 of the FAA provides the exclusive grounds for vacatur of arbitration awards under the FAA.  Hall Street Assoc., L.L.C. v. Mattel Inc., 128 S. Ct. 1396, 1404-06 (2008).  This section provides four instances in which a district court may vacate an arbitration award:

> (1) where the arbitration was procured by corruption, fraud, or undue means; (2) where there was evident partiality or corruption in the arbitrators, or either of them; (3) where the arbitrators were guilty of

> misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter was not made."

9 U.S.C. § 10(a). Silicon Power bases its Motion to Vacate Arbitration Award on subsections three and four. (9/11/09 Tr. at 4.)

Misconduct under § 10(a)(3) does not mean bad faith, but refers to "'misbehavior though without taint of corruption or fraud, if born of indiscretion.'" Sherrock Bros., Inc. v. DaimlerChrysler Motors Co., 260 Fed. App'x 497, 501 (3d Cir. 2008) (quoting Newark Stereotypers' Union No. 18 v. Newark Morning Ledger Co., 397 F.2d 594, 599 (3d Cir. 1968)). Moreover, although Section 3 provides for vacatur if the arbitrator refuses to hear pertinent and material evidence, not "'every failure to receive relevant evidence constitutes misconduct which will require the vacation of an arbitrator's award.'" Id. (quoting Newark Stereotypers' Union, 397 F.3d at 599). Indeed, misconduct will not be found under § 10(a)(3) "'unless the aggrieved party was denied a fundamentally fair hearing.'" Id. (quoting InterCarbon Bermuda, Ltd. v. Caltex Trading and Transport Corp., 146 F.R.D. 64, 72 (S.D.N.Y. 1993) and citing Teamsters Local 312 v. Matlack, Inc., 118 F.3d 985, 995 (3d Cir. 1997)).

In order to obtain vacatur under §10(a)(4), the movant must establish that the terms of the arbitration award are "completely irrational." Southco, Inc. v. Reell Precision Mfg. Corp., 556 F. Supp. 2d 505, 511 (E.D. Pa. 2008), aff'd Southco, Inc. v. Reell Precision Mfg. Corp., No. 08-2915, 2009 WL 1668608 (3rd Cir. June 16, 2009) ("Southco II"). "For an award to be 'completely irrational,' it is not enough that a court finds that the arbitrators erred, but rather it must find that